UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
UNITED STATES OF AMERICA,                    :
                                             :
         v.                                  :        **MEMORANDUM AND ORDER**
                                             :        21-CR-564 (WFK)
ANTHONY SANTAMARIA,                          :
                                             :
                    Defendant.               :
----------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On September 30, 2024, Anthony Santamaria[1] ("Defendant") pled guilty to one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, to wit, a violation of 18 U.S.C. § 1347. Plea Agreement (the "Plea") ¶ 1, ECF No. 375; Third Superseding Indictment (the "Indictment") ¶¶ 26–27.[2] The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to 120 months' incarceration; two (2) years of supervised release with both the standard and special conditions of supervision; mandatory restitution in accordance with the forthcoming Order of Restitution; forfeiture of U.S. currency and items identified in the Order of Forfeiture, ECF No. 499; and a $100.00 mandatory special assessment.

## I.  Background

### A.  Factual Background

From April 2017 through March 2022, Defendant conspired with others "to execute a scheme and artifice to defraud one or more health care benefit programs[.]"[3] Presentence Investigation Rep. (the "PSR") ¶ 1, ECF No. 406. To carry out the scheme, Defendant,

---

[1] Defendant is also known as "Big Boy," "Wade Watts," "Pablo Rodriguez," "Ryan Rusty," and "Bruce Peter." Third Superseding Indictment (the "Indictment") at 1, ECF No. 241; Presentence Investigation Rep. (the "PSR") ¶ 8, ECF No. 406.

[2] Citations are to the docket in *United States v. Ebady, et al.*, 21-CR-564. Page pincites refer to the ECF page numbers assigned to a filing where available, and where no ECF heading is present, to the page numbers listed in the original filing.

[3] Defendant states his active participation in the scheme ended in April 2021 when he was "cut off by other participants." Second Add. to PSR (the "Second Add.") at 2, ECF No. 435. The Government does not object to this modification but notes Defendant did not affirmatively withdraw from the conspiracy when he was "cut off" in 2021. *Id.* The U.S. Probation Office ("Probation") amended the PSR accordingly. *See* Second Add. at 2.

1

Brian Michael Sutton, ("Sutton"), Brycen Kay Millett ("Millett"), Joshua Manuel Alegria ("Alegria"), Hafizullah Ebady ("Ebady"), Hershel Tsikman ("Tsikman," together with Defendant, Sutton, Millet, Alegria, and Ebady, "Defendants"), Dela Saidazim ("Saidazim"), and David Gary Bishoff ("Bishoff") "fraudulently bill[ed] private health care benefit programs (the 'Private Insurers') for fraudulent telemedicine prescriptions and . . . launder[ed] the proceeds of the scheme." *Id.* ¶¶ 1, 14.

The scheme "involved over 50 pharmacies." *Id.* ¶ 13. "First, Bishoff and Millet used Call Centers" located in numerous locations around the globe—including the United States and Russia—to call "individuals enrolled in the Private Insurers . . . [and] offer medications at no cost [and] without any medical exams to determine the medical necessity for those medications." *Id.* ¶ 14.

Second, Saidazim and others "recruited licensed physicians and generated fraudulent prescriptions for [the enrolled individuals] under the physicians' National Provider Identifier (NPI) codes" often "without their authorization." *Id.* ¶ 15. These fraudulent prescriptions would also be generated regardless of whether or not the enrolled individuals agreed to receive any medications. *See id.* ¶ 14.

Finally, Ebady "locate[d] . . . brick and mortar pharmacies . . . with pre-existing pharmacy board registrations and insurance relationships with the Private Insurers (the 'Scheme Pharmacies')" and "negotiate[d] [their] purchase . . . by straw buyers and direct[ed] their day-to-day operations." *Id.* ¶ 16. Through these efforts, Defendants, Saidazim, and Bishoff were able to "conceal the true ownership and control of the Scheme Pharmacies from the Private Insurers in order to delay discovery of the fraud and maximize their illicit gains before the Private Insurers stopped reimbursing the Scheme Pharmacies." *Id.* The scheme resulted in the scheme

participants "own[ing], control[ing], and operat[ing], directly and indirectly, more than 50 Scheme Pharmacies across the United States[.]" *Id.* ¶ 17.

Defendant was specifically responsible for "train[ing] and manag[ing] individuals to input data [in the Remote Billing Software] and electronically submit fraudulent requests for reimbursement to Private Insurers" in furtherance of the scheme.[4] *Id.* ¶ 8. At Sutton's direction "and together with Alegria," Defendant identified Private Insurers with the highest paid reimbursement claims and then generated reimbursement requests for fraudulent prescriptions containing medications with the highest-reimbursement amounts. *See id.* ¶ 28; Second Add. to PSR (the "Second Add.") at 1, ECF No. 435.

With respect to his involvement with the Scheme Pharmacies established by Ebady, Defendant installed—either directly or indirectly—new computers and remote billing software for many of the Scheme Pharmacies "to submit reimbursement requests to Private Insurers for prescriptions that the pharmacies had purportedly filled." PSR ¶ 28; *see also* Second Add. at 2. Following his remote billing team's relocation to Moscow, Russia, Defendant traveled to and from Moscow to supervise and oversee the team as they "submitt[ed] the fraudulent reimbursement requests to the Private Insurers in the United States." PSR ¶¶ 18, 28.

As a result of the scheme, Private Insurers lost hundreds of millions of dollars they paid in fraudulently obtained reimbursements prior to ending their business relationships with the Scheme Pharmacies. *See id.* ¶ 22. The money paid out by the Private Insurers was transferred offshore and concealed by Defendants, Saidazim, and Bishoff before the Private Insurers

---

[4] Defendant objects to clarify he "did not play any role in generating fraudulent prescriptions but rather, the generation of the fraudulent prescription was done by other participants in the conspiracy." Second Add. at 1, ECF No. 435; *see also* Def.'s Obj. to PSR at 1, ECF No. 413; *see also* Def.'s Sent'g Mem. at 14, ECF No. 432. Nevertheless, "[t]he reimbursement submissions were fraudulent because there were no valid telemedicine visits and, therefore, no properly diagnosed medical necessity for the prescriptions." PSR ¶ 19.

discovered the fraud. *See id.* Records from the remote billing software show that between April 2017 and March 2022, "[Defendants] and their co-conspirators caused the submission of over $1.7 billion in reimbursement requests to be submitted to Private Insurers and that the Private Insurers paid over $500 million as a result of the fraudulent submission."[5] *Id.* ¶ 26.

### B. Procedural History

On June 7, 2021, the United States filed a then-sealed complaint against Ebady and Saidazim, alleging their participation in the above-mentioned scheme. ECF No. 2. A similar complaint was filed against Bishoff and Millet on March 7, 2022. ECF No. 1.

On November 8, 2021, a U.S. Grand Jury returned a two-count indictment against Ebady and Saidazim. ECF No. 29. On August 5, 2022, a U.S. Grand Jury returned a two-count superseding indictment (the "First Superseding Indictment") against Ebady, Saidazim, Bishoff, and Millet. ECF No. 92. On February 16, 2023, Saidazim waived indictment and the Government filed a single-count superseding information against her. ECF Nos. 154, 155.

On November 3, 2023, a U.S. Grand Jury returned a three-count third superseding indictment against Defendants (the "Indictment"). *See generally* Indictment, ECF No. 241. Shortly after the Indictment was filed, Defendant "was arrested in the Central District of California[.]" PSR ¶ 28. The Indictment charged Defendants with the following: Count One alleged conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349; Count Two alleged health care fraud in violation of 18 U.S.C. § 1347; and Count Three alleged conspiracy to money launder in violation of 18 U.S.C. § 1956(h). *See id.* ¶¶ 26–31. The Indictment also raised criminal forfeiture allegations pertaining to all counts. *See id.* ¶¶ 32–35.

---

[5] *See supra* Part I(A) n.3.

On September 30, 2024, Defendant pled guilty to Count One of the Indictment. *See* Plea ¶ 1; *see also* Indictment ¶¶ 26–27. Pursuant to the Plea, Defendant agreed not to file an appeal or otherwise challenge his sentence if the Court imposes a term of 120 months' incarceration or below. *See* Plea ¶ 4. The Government further agreed "[n]o further criminal charges [would] be brought against [Defendant] for his participation in criminal activity involving healthcare fraud, related money laundering and conspiring to commit the same as alleged in the [Indictment], all from the period April 2017 through March 2022[.]" *Id.* ¶ 5(a). Additionally, the Government agreed to dismiss the remaining counts of the Indictment with prejudice as to Defendant at the time of sentencing. *See id.*

In the Plea, the parties also stipulated to the Government moving "for an additional one-point reduction" (the "Global Disposition") "if [Defendant] and certain of his co-defendants all pl[ed] guilty on or before September 18, 2024[.]" Plea ¶ 2. The Global Disposition is discussed in more detail in paragraph fifteen of the Plea. *See* Plea ¶¶ 2, 15. The Government reserved its right to "elect not to recommend [this] reduction under the [U.S. Sentencing] Guidelines for a global disposition." Plea ¶ 15. The Government does not seek the Global Disposition to the U.S. Sentencing Guidelines (the "Sentencing Guidelines," or "Guidelines," or "U.S.S.G.") calculation in its sentencing memorandum, nor addresses whether it will move for the application of this reduction at the time of sentencing. *See generally* Gov't Sent'g Mem., ECF No. 434.

In the Plea, the parties further agreed "to the entry of a forfeiture money judgment in the amount of . . . $3,200,000.00" consistent with 21 U.S.C. § 853(p) and 18 U.S.C. § 982(b)(1) (the "Forfeiture Money Judgment"). Plea ¶¶ 6–12. On October 7, 2024, the Government filed a motion for the Court to enter a preliminary Order of Forfeiture, ECF No. 377, where Defendant agreed to pay the Forfeiture Money Judgment in full thirty days in advance of sentencing, or

otherwise "forfeit any other property of his up to the value of the outstanding balance[.] " Ord. of Forfeiture ¶¶ 2–3, ECF No. 499 (citing 21 U.S.C. § 853(p) and 18 U.S.C. § 982(b)(1)). The Court granted this motion the same day.

On February 16, 2023, Saidazim pled guilty to the sole count of the superseding information pursuant to a written plea agreement, charging her with conspiracy to commit health care fraud in violation of 18 U.S.C. § 371. *See* Saidaizim Plea Agreement ¶ 1, ECF No. 153. On December 13, 2023, she was sentenced to time served and restitution in the amount of $88,000.00. *See* Saidazim Mem. and Ord., ECF No. 315.

On March 31, 2023, Bishoff pled guilty to Count One of the First Superseding Indictment, charging him with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. *See* Bishoff Agreement ¶ 1, ECF No. 172. There is no sentencing hearing scheduled for Bishoff at this time.

On February 26, 2024, Millett pled guilty to Counts One and Three of the Indictment. *See* Millet Agreement ¶ 1, ECF No. 341. There is no sentencing hearing scheduled for Millett at this time.

On June 13, 2024, Alegria pled guilty to Counts One and Three of the Indictment pursuant to a written plea agreement. *See* Alegria Plea Agreement ¶ 1, ECF No. 358. There is no sentencing hearing scheduled for Alegria at this time.

On September 27, 2024, Tsikman pled guilty to Count One of the Indictment pursuant to a written plea agreement. *See* Tsikman Plea Agreement ¶ 1, ECF No. 374. On May 4, 2026, he was sentenced to 120 months' incarceration to be followed by two years of supervised release with both standard and special conditions of supervision, and mandatory restitution. *See* Tsikman Am. Mem. and Ord. at 1, ECF No. 503.

On October 22, 2024, Ebady pled guilty to Count One of the Indictment pursuant to a written plea agreement. *See* Ebady Plea Agreement ¶ 1, ECF No. 389. On May 6, 2026, Ebady was sentenced to ninety-seven months' incarceration to be followed by two years of supervised release with both standard and special conditions of supervision, mandatory forfeiture and restitution. *See* Ebady Am. Mem and Ord. at 1, ECF No. 504.

## II.    Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553. Together with 18 U.S.C. § 3553, the Guidelines operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state, in open court, the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form." *Id.* The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the Court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted

sentence disparities among defendants with similar records found guilty of similar conduct; and

(7) the need to provide restitution to victims of the offense. *See* 18 U.S.C. § 3553(a). The Court

now addresses each factor in turn.

## III. Analysis

### A. The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

The first § 3553(a) factor requires the Court to evaluate "the nature and circumstances of

the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1).

#### 1.    *Family and Personal Background*

Defendant was born on June 11, 1992, in Los Angeles, California, to the marital union of

his father, Juan Antonio Santamaria, and mother, Rosaura Rivera. *See* PSR ¶ 62. Defendant

reports being "primarily raised by his mother under 'poor' circumstances[]" in part because his

father "did not financially contribute to the household." *Id.* ¶ 65. Rosaura "was employed as a

certified nursing assistant at the time, work[ing] 16-hour workdays, seven days per week." *Id.*

"While [Rosaura] was at work, [Defendant's] father or paternal uncle would care for [him][,]"

both of whom abused alcohol. *Id.* His father also "abused …drugs (cocaine, marijuana and

methamphetamine)[,]" and therefore "the situation was not ideal." *Id.* ¶¶ 62, 65.

Juan did not contribute financially to the household because he "was in and out of jail"

throughout Defendant's childhood "for a variety of offenses, such as possession and distribution

of drugs, driving under the influence, retail theft and domestic violence." *Id.* ¶ 62. Additionally,

"[Juan] was under the influence of alcohol on a daily basis[,]" "caus[ing] [him] to be violent" to

the point where "law enforcement [were] 'always' at the house." *Id.* ¶ 66. "[Juan] never let his

anger out on [Defendant], as it was always against [Rosaura,]" however, "[Defendant] reported

that he was present during domestic violence incidents between his parents" and he would try to

defend his mother which resulted in his father hitting him. *Id.* When Defendant was nineteen years of age, "[Juan] was detained by Immigration and Customs Enforcement after serving a custodial term and he was deported to El Salvador." *Id.* ¶ 62. Defendant "maintained contact via telephone until [his] father's death[]" in 2022. *Id.*

Despite this challenging upbringing, "[Defendant] shares a close relationship with his mother, who is aware of the instant offense and conviction and remains supportive." *Id.* ¶ 63. Rosaura is fifty-seven years of age and resides in Hollywood, California where she works as a physical therapy assistant. *See id.* ¶¶ 62–63. She suffers from chronic health conditions. *See id.* ¶ 63.

"[Defendant] has one maternal half-brother[,]" Kelvin Rosario, who is thirty-eight years of age and resides with Defendant's mother. *Id.* ¶ 64. Defendant reports "[he] shares a close relationship with" his half-brother "who is aware of the instant offense and conviction and remains supportive." *Id.*

Defendant has been in a romantic relationship with his long-term partner, Alejandra Hernandez ("Hernandez"), since 2010. *Id.* ¶ 67. Hernandez is thirty-two years of age and resides in Tarzana, California, where she "is employed as an attendant at a retirement home[.]" *Id.* Hernandez "described [Defendant] as a 'charming, loving, caring, genuine, respectful, and pure-hearted' person." *Id.* ¶ 69. "[She] was 'shocked' when she learned of the instant offense because she though [sic] [Defendant] was working a 'normal job.'" *Id.* "[Hernandez] remains supportive[,]" but "does not know the specific details of the offense, as [Defendant] becomes sad when speaking about it." *Id.* ¶¶ 67, 69, 70; Hernandez reports "[t]he instant offense combined with [Defendant]'s alcoholism . . . put a strain on the couple's relationship[.]" *Id.* ¶ 67; *see infra* Part III(A)(4).

The couple share one fourteen-year-old child, Madelyn Santamaria Hernandez, who lives with Hernandez and is in the ninth grade. *See* PSR ¶ 68. "[Hernandez] described [Defendant] as a 'responsible' father, in that he picks up [Madelyn] from school and ensures that she maintains good grades." *Id.* ¶ 71. "[Hernandez] stated that it would be 'hard' to financially support herself and [Madelyn]" as well as pick her up from school should Defendant "be sentenced to a term of incarceration[.]" *Id.* "[Madelyn] is aware of the instant offense, as she was present at the time of [Defendant's] arrest[,]" and "remains supportive of [him]." *Id.* ¶ 68.

In addition to the above, the Court has considered the letters of support his friends and family—as well as the Upward Bound program—have submitted on his behalf. *See generally* Def.'s Sent'g Mem., Ex. A, ECF No. 432.

### 2.    *Educational and Employment History*

Defendant reports attending Grover Cleveland High School in Los Angeles, California, from 2006 to 2010. *See id.* ¶ 93. After completing the eleventh grade, Defendant withdrew from this school following the birth of his daughter. *See id.*

In 2010, Defendant enrolled at UEI College in Van Nuys, California, earning a pharmacy technician degree a year later. *See id.* ¶ 94. In 2014, Defendant became licensed as a pharmacy technician, but "let the license expire" on June 30, 2024, because of his involvement in the instant case. *Id.*

From 2013 to 2014, Defendant attended North Valley Occupational Center in Mission Hills, California, to "finish[] the missing credits from high school" and earn a certificate in general educational development. *Id.* ¶ 95. Following his completion of this program, Defendant began attending Los Angeles Valley College in Los Angeles, California, in 2014. *See*

10

*id.* ¶ 96. After the first semester, Defendant withdrew from the school "to focus on working, so he could financially support his family." *Id.*

Defendant's first record of employment was "as a marketer for an unrecalled bail bonds company[]" from 2007 to 2009. *Id.* ¶ 104. Income from this part-time role varied. *See id.* Defendant resigned "to pursue an opportunity as a janitor[.]" *Id.*

From 2010 to 2011, Defendant was a janitor for ABM Industries, a property maintenance company. *See id.* ¶ 103. Defendant reported earning $1,386.67 in monthly gross profits. *See id.* "[Defendant] left this employer to pursue an unpaid pharmacy externship." *Id.*

From 2011 to 2013, Defendant was a pharmacy assistant at Target Pharmacy. *See id.* ¶ 102. Defendant reported earning $1,386.67 in monthly gross profits. *See id.* Defendant sought alternative employment after being laid off "for unknown reasons." *Id.*

In 2013, Defendant received a security guard license. *See id.* ¶ 97. From 2013 to 2014, Defendant was a security guard for Global Security Concepts at Burbank Towne Center, an indoor shopping mall in Los Angeles, California. *See id.* ¶ 101. Defendant reported earning $1,733.33 in monthly gross profits. *See id.* A reason for departing from this role was not provided. *See id.* Defendant's security guard license expired on January 31, 2016. *See id.* ¶ 97.

From 2014 to 2015, Defendant was a pharmacy technician for State Pharmacy in Van Nuys, California. *See id.* ¶ 100. Defendant reported earning $2,600.00 in monthly gross profits. *See id.* A reason for departing from this role was not provided. *See id.*

From 2015 to 2021, Defendant was a biller/pharmacy technician at Warner West Pharmacy and Dharman Pharmacy. *See id.* ¶ 99. Both pharmacies were subsidiaries of Sutton Pharmacy, his co-defendant's business which was involved in the instant case. *See id.* Defendant reported earning $3,466.67 in monthly gross profits. *See id.* Defendant was

dismissed from this role, but "did not provide further explanation, as it relate[d] to the instant offense." *Id.*

Defendant is currently self-employed, earning approximately $4,875.00 in monthly gross profits by "resell[ing] clothing, apparel and shoes online (consignment)." *Id.* ¶ 98.

After reviewing Defendant's financial position, the U.S. Probation Office ("Probation") concludes "he appears unable to pay a fine." *Id.* ¶ 114.

### 3. *Prior Convictions*

Defendant has two adult criminal convictions prior to the instant case. On May 26, 2012, Defendant was arrested and later convicted for aiding and abetting in exhibition of speed in Los Angeles Superior Court, a misdemeanor. *See id.* ¶ 54. On July 20, 2012, Defendant was sentenced to twenty-four months of summary probation and either: ten days of custody; ten days of custody at Cal Trans[6]; or a $300.00 fine. *See id.* Defendant's term of probation was revoked and reinstated on both October 9, 2012, and January 14, 2013. *See id.*

On September 7, 2012, Defendant was arrested and later convicted in Los Angeles Superior Court with driving while his license was suspended/revoked, a misdemeanor. *See id.* ¶ 55. On October 9, 2012, Defendant was sentenced to thirty-six months of summary probation and either: ten days of custody, or a $300.00 fine. *See id.*

### 4. *Physical and Mental Health*

Defendant was "diagnosed with morbid obesity, which has caused secondhand issues, such as high blood pressure and diabetes." *Id.* ¶ 75. Between 2017 and 2020, Defendant underwent weight loss procedures. *See id.* ¶ 77.

---

[6] "Caltrans is an alternative to jail, in which individuals can assist the California Department of Transportation with roadside work." PSR ¶ 54 n.2.

In 2024, Defendant was assaulted by a family member who was later convicted and sentenced for the crime. *See id.* ¶ 74. As a result, Defendant "received stitches and bandaging[]" for a "broken nose and broken eye socket." *Id.* Defendant reports having "recovered from these injuries, except that he has a blind spot in his life eye, where he sees a flash of light." *Id.*

That same year, Defendant was diagnosed with leukocytosis, which Defendant monitors through "blood work samples a couple times per year." *Id.* ¶ 76.

As a result of his childhood experiences, Defendant reported he has experienced generalized anxiety and depression since his early twenties, but he was not formally diagnosed and treated until he began substance abuse treatment. *See id.* ¶¶ 81–82. He has been prescribed several medications to treat his depression and anxiety, and Defendant's substance abuse treatment provider reports "[he] has been compliant with his psychiatric medications[.]" *Id.* ¶¶ 81, 83. Otherwise, "[Defendant] did not report a history of thoughts of self-harm or gambling problems." *Id.* ¶ 84.

In addition to the above, the Court has considered the report prepared by Defendant's psychologist addressing his mental health. *See* Def's Sent'g Mem., Ex. A.

### 5.    *Substance Abuse*

Defendant reports a history of substance abuse dating back to age fifteen. *See id.* ¶ 86. Defendant engaged with marijuana "because his father used and sold the drug, so he was always around it." *Id.*; *see supra* Part III(A)(1). In 2022, "[Defendant] stopped using marijuana . . . after it worsened his anxiety." PSR ¶ 86.

When Defendant was a teenager, he consumed alcohol a few times per week— "sometimes causing him to black out"—"because he was around his father and uncle, both of

13

whom abused alcohol." *Id.* ¶ 87; *see supra* Part III(A)(1).  Defendant reports later "us[ing] alcohol to self-medicate from his depression and anxiety."  PSR ¶ 87.

Defendant engaged with powder cocaine "pretty often" "in his twenties because the individuals he worked for always had it readily available." *Id.* ¶ 88.  In November 2023, "[Defendant] stopped using cocaine . . . on his own accord because he knew it was a problem." *Id.*

"[Defendant] self-enrolled into a detoxification program" in October 2024.  *Id.* ¶ 89. After successful discharge from the program, "[Defendant] was transferred to. . . intensive outpatient substance abuse treatment (five hours per day)." *Id.*

"Thereafter, on December 26, 2024, [Defendant] began residing at . . . a sober living facility . . . provid[ing] a structured and supportive environment where trained individuals 'lightly' supervise the attendees['] transition to move forward into society." *Id.*  At the facility, "[Defendant] was diagnosed with alcohol use disorder, cocaine use disorder, major depressive disorder, generalized anxiety disorder and post-traumatic stress disorder." *Id.* ¶ 91; *see supra* Part III(A)(4).  "[Defendant] currently attends daily alcoholics anonymous meetings and weekly meetings with his sponsor."  PSR ¶ 89.  Defendant still resides at the facility, *see* Def.'s Sent'g Mem. at 22, and "has met his treatment goals" but "it is unknown when [he] will fully transition back to society."  PSR ¶¶ 89, 91.

In addition to the above, the Court has considered Defendant's treatment records and the letters from applicable treatment providers.  *See* Def.'s Sent'g Mem., Ex. C.

      6.     *Nature and Circumstances of the Offense*

The Court's previous statements address the nature and circumstances surrounding the instant offense.  *See supra* Part I.

## B. The Need for the Sentence Imposed

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]" 18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct. "Fraud schemes like the one perpetrated in this case threaten the integrity of the American health care system." Gov't Sent'g Mem. at 12. "Over the years, [Defendant] worked closely with Sutton, the leader of the criminal scheme, and had a full picture of how the fraudulent scheme worked." *Id.* at 9. Defendant participated in the scheme until "his co-conspirators cut him out," meaning "there is no evidence that [he] would not have happily continued to advance the conspiracy and collect his checks until his arrest." *Id.* at 11 (citing Def.'s Sent'g Mem. at 14).

The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a)(2).

## C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3). Defendant pled guilty to one count of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349. *See* Plea ¶ 1.

15

Defendant faces a maximum term of ten years' incarceration and no minimum term. 18

U.S.C. § 1347. Defendant also faces a maximum term of three years of supervised release. 18

U.S.C. §§ 3583(b)(2), 3559(a)(4). If a condition of release is violated, Defendant may be

sentenced to up to two years of incarceration without credit for pre-release incarceration or time

previously served on post-release supervision. 18 U.S.C. § 3583(e). Defendant is eligible for a

term of probation of one to five years. 18 U.S.C. § 3561(c)(1).

In addition to facing terms of incarceration and supervised release, Defendant faces a

maximum fine of $250,000.00. 18 U.S.C. §§ 3571(b)(2)–(3), (d). Unless extraordinary

circumstances exist, the Court must impose one of the following as a condition of probation: a

fine, restitution, or period of community service. 18 U.S.C. § 3563(a)(2).

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the

sentencing range established for . . . [t]he applicable category of offense committed by the

applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

The Government and Defendant stipulated to a Total Adjusted Offense Level of 33 in the

Plea.[7] *See* Plea ¶¶ 2, 16.

The applicable provision of the Guidelines is § 2X1.1, which directs the Court to apply

the "base offense level for the substantive offense." U.S.S.G. § 2X1.1(a). Here, the Base

---

[7] The parties initially calculated a Subtotal Adjusted Offense Level of 36. *See* Plea ¶ 2. The Total Adjusted Offense Level the parties stipulated to is 32 because the Subtotal Adjusted Offense Level was subject to a two-level reduction if "[Defendant] clearly demonstrated acceptance of responsibility," a one-level reduction if "[he] and certain co-defendants all plead[] guilty on or before [September 30, 2024]," and a final one-level reduction if "[he] plead[] guilty on or before September 18, 2024." *Id.* ¶¶ 2, 15. Defendant failed to meet the conditions of the Global Disposition as of the time he signed the Plea, and therefore the parties did not stipulate to the applicable one-level reduction. *See id.*

16

Offense Level for the substantive offense—health care fraud—is found in U.S.S.G. § 2B1.1,

which covers, *inter alia*, forms of theft. U.S.S.G. § 2B1.1. Under U.S.S.G. § 2B1.1(a)(2),

Defendant has a Base Offense Level of 6. *Id.*; PSR ¶ 41; Gov't Sent'g Mem. at 6; Plea ¶ 2.

Probation and the Government agree certain adjustments should apply to Defendant.

First, they agree U.S.S.G. § 2B1.1(b)(1)(O) adds 28 levels because the total loss stemming from

Defendant's involvement in the offense—based on the Government's estimates and the Plea—

was greater than $250,000,000.00, but less than $550,000,000.00. U.S.S.G. § 2B1.1(b)(1)(O);

PSR ¶ 42; Gov't Sent'g Mem. at 6; Plea ¶ 2.

Second, they agree U.S.S.G. § 2B1.1(b)(2)(A)(i) adds 2 levels because the offense

involved ten or more victims. U.S.S.G. § 2B1.1(b)(2)(A)(i); PSR ¶ 43; Gov't Sent'g Mem. at 6;

Plea ¶ 2.

Finally, they agree U.S.S.G. § 2B1.1(b)(10)(B) adds 2 levels because a substantial part of

the fraudulent scheme was committed from outside the United States and involved sophisticated

means.[8] U.S.S.G. §§ 2B1.1(b)(10)(A)–(C); PSR ¶ 44; Gov't Sent'g Mem. at 6; Plea ¶ 2.

With respect to mitigating factors, Probation and the Government also agree a three-level

reduction should apply for Defendant's timely acceptance of responsibility under U.S.S.G. §§

3E1.1(a) and (b). U.S.S.G. §§ 3E1.1(a)–(b); PSR ¶¶ 50–51; Gov't Sent'g Mem. at 6; Plea ¶ 2.

All parties agree Defendant's Criminal History Category is I because he has a prior adult

criminal conviction.[9] U.S.S.G. §§ 4A1.1(c), (e)(2); PSR ¶¶ 53–57; Gov't Sent'g Mem. at 6–7;

---

[8] Probation asserts Defendant qualifies for this adjustment under U.S.S.G. §§ 2B1.1(b)(10)(A)–(B), while the Government asserts Defendant also qualifies for this two-level adjustment under § 2B1.1(b)(10)(C).

[9] In the PSR, Probation correctly identifies Defendant as within Criminal History Category I. *See* PSR ¶¶ 56–57. However, its recommendation report states Defendant is in Criminal History Category II. *See* Prob. Sent'g Recommendation ("Prob. Sent'g Rec.") at 2, ECF No. 406-1. This appears to be a clerical error, given Probation's reported Guidelines range in the recommendation remains as if Defendant's Criminal History Category is I. *See id.* at 3.

Def.'s Sent'g Mem. at 17; Plea ¶ 2. This is why the parties do not maintain the Plea stipulation to a two-level reduction if Defendant was a Zero-Point Offender. *See* Plea ¶ 2; Gov't Sent'g Mem. at 6–7 (citing PSR ¶¶ 41–57); Def. Position on Guidelines Calculation ("Def.'s Sent'g Mem. Supp.") at 1, ECF No. 507. Defendant did not provide a Guidelines calculation in his sentencing materials but agrees "his one criminal history point is the result of a conviction for driving while his license was suspended from 2012." Def.'s Sent'g Mem. at 17 (citing PSR ¶ 55); *see also* Def.'s Sent'g Mem. Supp. at 1.

Defendant's conviction counts for the purpose of computing criminal history because it involved driving while his license was suspended/revoked and resulted in "a term of probation of more than one year." U.S.S.G. § 4A1.1(c)(1); PSR ¶ 55; *see supra* Part III(A)(3). Another of Defendant's adult criminal convictions is not counted for purposes of computing criminal history because it was the result of a minor traffic infraction, i.e., speeding. U.S.S.G. § 4A1.1(c)(2); PSR ¶ 54; *see supra* Part III(A)(3).

The parties agree, pursuant to the Guidelines Sentencing Table, a Total Adjusted Offense Level of 35 and a Criminal History Category of I results in a Guidelines range of 168 to 210 months' incarceration. U.S.S.G. § 5A; Prob. Sent'g Recommendation ("Prob. Sent'g Rec.") at 3, ECF No. 406-1; Gov't Sent'g Mem. at 6; Def.'s Sent'g Mem. Supp. at 1. This Guidelines range is subject to a ten-year statutory maximum under 18 U.S.C. § 1347. Plea ¶ 1(a).

This Court appreciates the sentencing arguments raised by all parties and has seriously considered each in turn.

### E. Pertinent Policy Statement(s) of the Sentencing Commission

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5). In his

supplemental filing, Defendant has directed the Court's attention to now-repealed U.S.S.G. § 4A1.3. Def.'s Sent'g Mem. Supp. at 1–2. U.S.S.G. § 4A1.3, which was removed effective November 1, 2025, provided as follows:

> If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

U.S.S.G. § 4A1.3(b)(1) (repealed Nov. 1, 2025).

Although repealed, "the Sentencing Commission intended that 'judges who would have relied upon facts previously identified as a basis for a departure would continue to have authority to rely upon such facts to impose a sentence outside the applicable guidelines range as a variance under 18 U.S.C. § 3553(a)." Def.'s Sent'g Mem. Supp. at 2 (citing U.S.S.G Ch.1, Pt.A, intro. comment (Nov. 2025)).

The Court acknowledges U.S.S.G. § 4A1.3(b)(1) and factors its underlying rationale and policy into the Court's decision. Otherwise, the parties have not drawn the Court's attention to any further applicable policy statements. Finding no others on its own, the Court proceeds to the next § 3553(a) factor.

### F. The Need to Avoid Unwarranted Sentence Disparities

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6).

Defendant argues his "level of culpability is closest to that of [Saidazim]" and they share "close parallels between [their] personal lives," which he states, "provides an appropriate benchmark to consider in fashioning [his] sentence." Def.'s Sent'g Mem. at 30–32. Defendant points to the following parallels between himself and Saidazim: both (1) "joined the Sutton

operation at a time in their lives when they were young, impressionable and had few other options"; (2) "lacked any real decision-making authority in the operation"; (3) "took their decisions primarily from Sutton and others who closely monitored their work"; (4) "had personal knowledge of the operations in Russia, but no authority or decision-making role in the Russia operation"; (5) "fled political instability" in their respective countries of origin; (6) "grew up with immigrant parents who struggled in the United States"; (7) and have a Criminal History Category I. *Id.* at 31. Furthermore, while Defendant admits "he played a role in various pharmacy audits and received significantly more money than [Saidazim] . . . during the course of the conspiracy[,]" he believes this is mitigated by how "he received a tiny fraction of the amount of the overall revenue . . . and received significantly less monetary benefit from the scheme than Sutton and others who he took direction from." *Id.* at 32.

The Government disagrees. As a preliminary matter, the Government notes "the Court must fashion a sentence that avoids unwarranted sentencing disparities among similarly situated defendants nationwide, not merely with respect to two co-defendants." Gov't Sent'g Mem. at 13 (citing *United States v. Stewart*, 23-CR-6330, 2024 WL 3517853, at *2 (2d Cir. Jul. 24, 2024)). Even so, the Government distinguishes Defendant from Saidazim, noting they "are not even remotely similarly situated." *Id.* The Government argues Defendant and Saidazim differ primarily in: (1) when they became involved in the scheme; (2) their knowledge of engaging in criminal conduct; (3) their mitigating factors, such as Saidazim qualifying as a "minor participant"; and (4) their levels of compensation. *Id.* at 13–14.

The Court has reviewed and considered carefully the parties' arguments. For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentence disparities.

### G. The Need to Provide Restitution

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).

Pursuant to the Plea, Defendant agreed to a Restitution Order "in the full amount of $521,733,092.88 to be paid in accordance with the restitution order to be filed under seal with the Court in connection with the plea." Plea ¶ 1(e); *see also* 18 U.S.C. §§ 3663A and 3664.

According to Probation, "a detailed list of each victim, their contact information, and their associated losses, has not been provided by the Government[]" and therefore "Affidavits of Loss could not be forward[ed] to them." PSR ¶ 27. The Government has also not included in their writing any victim-related information required to determine the amount in restitution. *See generally* Gov't Sent'g Mem.

As of the time of sentencing, no other responses have been received regarding victim losses. The Court reserves its right, pursuant to 18 U.S.C. § 3664(d)(5), to hold an evidentiary hearing within ninety days of sentencing to determine the specific amounts owed to Defendant's victims. The Court will issue a Final Order of Restitution accordingly.

## IV.    Conclusion

For the reasons set forth above, the Court sentences Defendant to 120 months' incarceration; two (2) year(s of supervised release with both the standard and special conditions of supervision; restitution as set forth in the forthcoming Order of Restitution; forfeiture of U.S. currency and items identified in the Order of Forfeiture, issued on October 7, 2024; and a $100.00 mandatory special assessment. This sentence is sufficient, but not greater than necessary, to accomplish the purposes of § 3553(a). The Court does not impose a fine given Defendant's present financial circumstances.

The Court expressly adopts the factual findings of the PSR and addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion. The Court advises Defendant he has fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

**SO ORDERED.**

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: May 19, 2026
Brooklyn, New York

22